# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# OCALA DIVISION

**UNITED STATES OF AMERICA**

v.                                                                                      Case No: 5:19-cr-16-Oc-28PRL

**CHARLIE LEE WRIGHT, JR.**
_____

## REPORT AND RECOMMENDATION[1]

Defendant Charles Lee Wright, Jr. is charged by indictment with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and § 924(e). (Doc. 16). A jury trial is currently scheduled for the December 2019 trial term. (Doc. 58). Wright has filed a motion to suppress all physical and testimonial evidence seized as the result of the warrantless entry onto his property on January 15, 2019. (Doc. 40). He also claims that evidence obtained pursuant to the subsequent search warrant and federal complaint were tainted by the warrantless entry, and thus, should be suppressed. Upon a review of the record, and after a hearing, I submit that his motion should be denied.

**I.  BACKGROUND[2]**

On January 15, 2019, at approximately 8:15 p.m., William Ames called 911 and reported that Wright had just committed a strong-arm robbery at Ames' residence in Summerfield, Florida. Ames advised that Wright shoved him down and took jewelry by force. He provided a description

---

[1] Within 14 days after being served with a copy of the recommended disposition, a party may file written objections to the Report and Recommendation's factual findings and legal conclusions. *See* Fed. R. Civ. P. 72(b)(3); Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1)(B); Local Rule 6.02. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

[2] The Court held a hearing on Wright's motion on October 16, 2019 during which Marion County Sheriff Department Officers John Lightle, Ryan Stith, Bryant Gray, and Joe Jenkins testified. In addition to the testimony, at the hearing, the Government presented the helicopter video taken during the incident, which the Court reviewed. The transcript of the hearing is filed on the docket. (Doc. 55).

of Wright as well as his vehicle and his general direction of travel. A MCSO database search revealed that Wright lived at a nearby address on SE 25th Avenue in Summerfield—approximately 17 minutes (8.7 miles) from Ames' residence.

At approximately 8:25 p.m., Deputy Ryan Stith responded to Ames' residence. Ames advised that he had known Wright for several years and that he had done work for him around his house. He gave a physical description of Wright, a general description of where Wright lived, and a description of the Blue Ford pickup truck that Wright was driving. Ames' description of Wright's residence matched the location found in the MCSO database search.

Ames explained that Wright had come to his residence that night to collect money that he was owed. The men discussed the issue in the living room, but Wright became angry, raised his voice, and knocked over a lamp, at which point Ames went to his bedroom to get money. Ames reported being in fear of Wright not only because of his anger, but also his size and the fact that he was previously in prison. Wright followed him into the bedroom, struck him in the face, pushed him down on the bed, and then took jewelry items off the dresser, including a Rolex watch with a cream face and a gold bezel and a gold chain with a crown charm. Ames stated that Wright then left his residence in a hurry.

Deputy Stith also spoke to Vanessa Villanueva, Ames' girlfriend, who had been in the bedroom cleaning during the incident. She advised that she had heard the argument between the men in the living room and witnessed Ames come in the bedroom and Wright shove him down on the bed, take the items off the dresser, and then leave the residence. Deputy Stith also spoke to Gary Hardee, Mr. Ames' neighbor from across the street, who saw Wright arrive in his blue pickup truck and go inside. The neighbor stated that several minutes later he heard a slamming noise and he observed Wright walking toward his truck carrying something down by his waist. Wright went

to the passenger's side of the vehicle, opened the door, leaned in for a moment, and then walked around to the driver's side, got in, and drove off in a hurry.

The information gathered on scene was communicated to other units who were headed to Wright's residence, including a marked patrol unit and the Air 1 helicopter. Deputy Bryant Gray was initially dispatched to the scene of the robbery but was re-directed to the suspect's residence because it was believed that he might return there. Deputy Gray was advised that the robbery suspect was a black male driving a blue Ford truck, and he was given the tag number.

Wright's residence was in a rural part of Marion County on 2.42 acres and it included a mobile home with a wooden porch. It was on a dirt road, with a lot of wooded area around it. At approximately 8:46 p.m., Deputy Gray arrived at the residence and saw a blue truck, matching the description and tag number for which he was looking, parked outside of the front gates of the property. (Government Exhibits 5, 6). The gates were ajar. The hood of the truck was warm to the touch suggesting that the engine had recently been driven. AIR 1 was overhead, and using its infrared camera system, confirmed to Deputy Gray that a significant amount of heat was coming from the truck's engine. (Government Exhibit 2).

Within 2 minutes of his arrival at the residence, AIR 1 advised Deputy Gray that somebody was running out the back of the residence; that the person stopped and was bent down and hiding behind a travel trailer on the back of the property. (Government Exhibits 3, 4). Indeed, video footage from AIR 1 showed an individual fleeing from the back of the residence, crossing the yard while looking back at the helicopter, and hiding behind the travel trailer. Deputy Gray assumed that it was the robbery suspect and he was concerned that the fleeing suspect would hide or destroy evidence. He was also concerned for officer safety because he did not know if Wright was armed.

Deputy Gray observed a wire fence encircling the property on either side of the front gates. He entered the yard by going over a portion of the fence that was partially down (near the truck) and headed towards the rear of the property. It was completely dark. Deputy Gray announced himself as the Marion County Sheriff's Office and directed anybody out there to come forward with their hands up. At that point, at approximately 8:49 p.m., Wright came around the side of the travel trailer with his hands up. Deputy Gray advised Wright to get on the ground, place his hands behind his head and stay in that position. Wright was then detained and placed in the patrol car pending detectives coming on the scene. Wright was wearing the Rolex watch and necklace with the crown reported stolen by Ames.

Officer John Lightle, a major crimes detective, responded to Ames' residence that evening. He first spoke to Deputy Stith and then Ames, Villanueva and Hardee.[3] Detective Lightle then responded to Wright's residence to further his investigation. He conducted a post-Miranda interview with Wright, who denied robbing Ames and stated that Ames was lying. Wright stated that the watch and necklace belonged to him and the victim had "pawned" the items to him in the past. He claimed to have pictures on his cell phone, but he was unable to locate any images of him wearing the jewelry in question. Wright denied taking any other jewelry from Ames. Detective Lightle asked for permission to search Wright's property for other items of missing jewelry, but Wright refused. MCSO then secured the area and obtained a search warrant. (Government Exhibit 16).

---

[3] The statements given by the witnesses were consistent with statements reported by Deputy Stith. Detective Lightle testified that at some point Ames expressed concern about getting Defendant in "big trouble" and asked if Defendant would get in less trouble if he said he took the items but didn't push him down. (Tr. 45-46). Detective Lightle advised him that it is a crime to knowingly provide false information to law enforcement during a felony investigation. Ames did not ultimately recant or change his testimony. (Tr. 65-67).

The next day, January 16, 2019, MCSO Officers executed the search warrant. The remaining items of missing jewelry were not found; however, numerous contraband firearms and ammunition were found, which Wright could not lawfully possess as a convicted felon. The recovered firearms included loaded handguns concealed in the kitchen freezer and master bedroom and three other firearms, assorted ammunition, and high-capacity ammunition magazines in the backseat of a stolen Porsche on the property. After Wright's subsequent federal arrest, Wright admitted in a post-Miranda interview, that he had touched the loaded handguns recovered by the MCSO in the kitchen freezer and the master bedroom of the residence.

## II.    Standards

The Fourth Amendment protects persons and their "houses, papers, and effects" from "unreasonable searches and seizures." U.S. Const. amend IV. This protection extends to the curtilage of a person's home, which is "part of the home itself for Fourth Amendment purposes." *Florida v. Jardines,* 569 U.S. 1, 6 (2013) *(quoting Oliver v. United States,* 466 U.S. 170, 180 (1984). Under the Fourth Amendment, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Franklin,* 694 F.3d at 7 (quoting *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980)). The government bears the burden of proving an exception to the warrant requirement. *United States v. Holloway,* 290 F.3d 1331, 1337 (11th Cir.2002).

## III.    Discussion

Defendant claims that the warrantless entry onto his property on the evening of January 15, 2019 was unlawful. As an initial matter, the parties disagree as to whether the travel trailer—behind which Defendant was hiding—was in the curtilage. However, even if it was, and Fourth

Amendment protections applied, the Government has shown that Deputy Gray's warrantless entry was justified by exigent circumstances.

The exigent circumstances doctrine applies when there is a compelling need for official action, but no time for law enforcement to secure a warrant. *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002). The doctrine extends to situations involving "danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit." *Id.*; *see also, Johnson v. United States,* 333 U.S. 10, 14-5 (1948) (noting that exceptional circumstances can justify a warrantless search including a "suspect was fleeing or likely to take flight."); *United States v. Fuller*, 572 Fed. Appx. 819, 821 (11th Cir. 2014) (officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect).

There is no question that the events that evening unfolded quickly. Indeed, Wright was detained at his property only 30 minutes after the strong-arm robbery had occurred. Wright was unequivocally identified as the perpetrator of the crime and he was seen leaving Ames' property in his truck at a high speed, heading in a direction consistent with traveling to his own residence, and according to the testimony at the hearing, it would have taken him about twenty minutes to get there. AIR 1 and Deputy Gray promptly responded to Wright's address, and they confirmed that Wright's truck was there, parked outside the gate, and the engine was warm.

And perhaps, had Wright simply stayed in his residence, a warrantless entry would not have been justified. However, that is not what happened. Instead, within two minutes of Deputy Gray appearing on scene, AIR 1 advised him that an individual, whom he reasonably believed to be the suspect of a violent felony, was fleeing from the back of the house onto the wooded property under the cover of night. There was a very real danger that the suspect would attempt to hide or destroy evidence. And while AIR 1 reported that the individual had stopped behind the travel

trailer, Deputy Gray had no way to know whether he would continue fleeing the property and whether he posed a danger. I submit that under these circumstances, the warrantless entry onto Wright's property was justified. Defendant's suggestion that the Government, instead, should have kept a visual on Wright via AIR 1 while it secured a warrant, is patently unreasonable.

Accordingly, Defendant's motion to suppress should be **DENIED**.[4]

Recommended in Ocala, Florida on October 29, 2019.

_____
PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy

---

[4] Accordingly, Defendant's argument that the subsequent search warrant and criminal complaint were tainted by the warrantless entry, is without merit.